**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **PATTY ADA HUNTER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 3:11-CV-2649-O** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Patty Ada Hunter ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Court considered Plaintiff's and the Commissioner's Cross-motions for Summary Judgment and the supporting briefs. The Court reviewed the record in connection with the pleadings. The Court recommends that Plaintiff's Motion for Summary Judgment be granted, that Defendant's Motion for Summary Judgment be denied, and that the final decision of the Commissioner be reversed and remanded for further consideration.

**Background**[1]

**Procedural History**

On April 26, 2007, Plaintiff protectively filed an application for Disability Insurance Benefits, alleging a disability onset date of January 9, 2006. (Tr. 158-60.) Plaintiff alleged disability due to

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

vision problems from cranial nerve damage, severe photophobia,[2] vertigo, headaches, and Raeder's syndrome.[3]  (Tr. 187.)  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 68-69, 80-90.)  Pursuant to Plaintiff's request, an administrative law judge ("ALJ") conducted a hearing on August 20, 2008, at which Plaintiff, represented by counsel, testified.  (Tr. 28-50, 91-92.)  The ALJ issued a decision on September 18, 2008, finding Plaintiff not disabled.  (Tr. 70-76.)  Plaintiff sought review of the ALJ's decision.  The Appeals Council granted review and remanded the matter to an ALJ for further administrative proceedings on May 26, 2010.  (Tr. 77-79.)  The ALJ held a supplemental hearing on January 20, 2011, and issued a decision on March 7, 2011, finding Plaintiff not disabled.  (Tr. 9-20, 51-67.)

Plaintiff sought review of the ALJ's decision, and the Appeals Council denied Plaintiff's request on August 20, 2011.  (Tr. 1-7.)  Accordingly, the ALJ's decision became the Commissioner's final administrative decision for purposes of judicial review.  *See* 20 C.F.R. §404.981.

## Plaintiff's Age, Education, and Work Experience

Plaintiff was born on March 14, 1946, and was 59 years of age when she stopped working on January 9, 2006.  (Tr. 158.)  Plaintiff has 14 years of education.  (Tr. 279.)  She worked as an executive administrative assistant in a CPA firm from 1991-2006.  (Tr. 188.)  The vocational expert ("VE") described Plaintiff's past relevant work as sedentary and skilled.  (Tr. 49, 65.)

---

[2] Photophobia is an abnormal visual intolerance of light.  Dorland's Illustrated Medical Dictionary 1383 (29th Ed. 2000).

[3] Raeder's syndrome refers to unilateral paroxysmal (spasm or seizure-like) neuralgic (extending along the nerve) pain in the face associated with sympathetic (nervous system) palsy.  Dorland's Illustrated Medical Dictionary 1765 (29th Ed. 2000).

**Plaintiff's Medical Evidence**

Plaintiff alleged disability due to Sjogren's syndrome with severe photophobia, migraine headaches with dizziness and vertigo, left eye ptosis,[4] fibromyalgia, lumbar disc herniation, hypertension, and an adjustment disorder.

Plaintiff was admitted to Medical City Hospital of Dallas from January 9, 2006 to January 14, 2006, for dizziness with nausea and vomiting. (Tr. 460.) Tests showed a CNS abnormality and she was treated with Topamax and Imitrex and discharged home with a diagnosis of dizziness, photophobia, migraines, stress and anxiety, and hypertension. (*Id.*) Following discharge, Plaintiff saw her primary care physician, Ambareen Salam, M.D., who noted continuing issues with photophobia and dizziness, likely related to migraines. (Tr. 327-335.) Dr. Salam adjusted medications in an attempt to improve the photophobia and dizziness, advised Plaintiff not to drive, and referred her to several specialists. (Tr. 330-334.)

On February 2, 2006, Plaintiff was evaluated by psychiatrist Dr. P. Lawrimore, who diagnosed her with anxiety and depression related to her physical problem of photophobia and assessed her Global Assessment of Functioning ("GAF") at 50, which is indicative of severe occupational limitations.[5] (Tr. 291-296.) She was seen by an ophthalmologist at UT Southwestern on February 26, 2006, and the ophthalmologist found no ocular diseases. (Tr. 555.)

---

[4] Ptosis of the eyelid is a neurologic disorder affecting the third cranial nerve. (Tr. 371.)

[5] GAF of 41-50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000) (DSM-IV-TR).

On March 10, 2006, Plaintiff was evaluated by Leslee Ballscovel, M.D., at Brooke Army Medical Center for debilitating ptosis of the left eye and severe photophobia.   (Tr. 370.) Ophthalmological exam revealed OPK nystagmus of abnormal symmetry to the right for 40 deg/sec consistent with CNS abnormality, ptosis of the left eye persisting on downgaze, and pupils that were difficult to assess due to severe sensitivity to light even in a dark room.  (Tr. 370-371.)  Dr. Ballscovel diagnosed ptosis of the eyelid and photophobia with a neurological disorder affecting the 3rd cranial nerve and referred Plaintiff for evaluation of possible underlying neurological disorders including multiple sclerosis.  (Tr. 371.)

Plaintiff saw neurologist Allan Halliday, M.D., on March 27, 2006.  (Tr. 375.)  Dr. Halliday stated that Plaintiff suffers from cluster headaches which have responded to treatment with depakote, HTN, sleep apnea and incapacitating photophobia.  (Tr. 376.)  He noted that the photophobia has remained difficult to treat, and referred Plaintiff for a neuro-ophthalmology evaluation.  (*Id.*)

 On July 31, 2006, Plaintiff was evaluated by Steven R. Grimes, M.D., at the Ophthalmology-Neurology Clinic at Brooke Army Medical Center for severe photophobia and headaches with numbness on the left side of the face.  (Tr. 321, 376.)  Dr. Grimes noted that Plaintiff "compensates by living in a dark room and closing her eyes most of the time," and diagnosed common migraines, presbyopia, and incapacitating photophobia.  (Tr. 322, 377.)  Dr. Grimes noted decreased sensation in the V1-V3 distribution of the left face and mentioned trigeminal neuralgia as a differential diagnosis.  (Tr. 327, 377.)

On March 27, 2007, Plaintiff saw Lance Le, O.D., who fitted her with custom light filtering contact lenses.  (Tr. 351.)  Dr. Le noted that Plaintiff has a history of cranial nerve damage and

suffers from severe photophobia that requires constant wear of sunglasses even with normal room lighting. (*Id.*)  The lenses did not help filter the light and caused dry eyes and puffiness.  (Tr. 361.)

On April 30, 2007, Plaintiff was evaluated by cardiologist Dr. Kawalsky for Raeder's syndrome, photophobia, hypertension, hyperlipidemia, sleep apnea, and vertigo.  (Tr. 391.) Plaintiff's medications were adjusted and on June 21, 2007, Dr. Kawalsky referred her to the Mayo Clinic for neurologic evaluation of Raeder's syndrome with significant photophobia.  (Tr. 389.)

Plaintiff was evaluated by Jonathan Walker, M.D., at the Neurotherapy Center of Dallas in June 2007, who prescribed Iodine therapy for her photophobia.  (Tr. 357-360.)

Plaintiff was evaluated by neurologist F.M. Cutrer, M.D., at the Mayo Clinic in September 2007 for headaches that occur once a week and last for approximately two days, extreme photophobia that requires her to be in complete darkness, and vertigo. (Tr. 407.) Ophthalmologist Brian Younge, M.D., opined that the headaches and photophobia did not appear to be due to ocular disease. (Tr. 406.) An MRI of the head was normal and she was recommended to undergo medication adjustment to control the headaches, in hopes that the photophobia would subside. (Tr. 401.)

On September 27, 2007, Plaintiff's primary care treating physician, Dr. Salam, opined that Plaintiff is unable to work, stating that she cannot see due to light sensitivity and noting diagnoses of photophobia and headaches that have not responded to medications.  (Tr. 430.)

On January 1, 2008, Plaintiff was evaluated by psychiatrist Dr. Roche, who diagnosed Adjustment Disorder secondary to extreme photophobia, and assessed GAF at 50, which is indicative of severe occupational limitations.  (Tr. 418.)

Plaintiff continued to be treated at the Mayo Clinic in 2008 with medications including Amitriptyline, Verapamil, and Neurontin.  (Tr. 400.)  In April 2008, Dr. Cutrer noted that Plaintiff

continues to experience such profound photophobia that she is unable to function well. (*Id.*) In October 2008, Dr. Cutrer recommended possible treatment at the Pain Rehabilitation Center. (Tr. 662.)

At a follow-up appointment for her hypertensive disease on December 8, 2008, treating cardiologist Dr. Kawalsky noted that Plaintiff is photophobic, wears dark glasses, and requires the lights to be dimmed during examination. (Tr. 663.)

On February 20, 2009, Plaintiff consulted a retina specialist, Dr. Torti, who diagnosed severe photophobia and recommended B-12 vitamin shots. (Tr. 702, 725-726.) Plaintiff continued to see primary care physician, Dr. Salam, regularly for her migraine headaches and photophobia. (Tr. 696-702.) On September 17, 2009, Dr. Salam noted symptoms of eye irritation and burning, in addition to continuing light sensitivity. (Tr. 701.)

On January 7, 2010, Plaintiff was evaluated by rheumatologist John J. Cush, M.D., for possible Sjogren's syndrome. (Tr. 732.) Dr. Cush noted a history of hypertension, migraines, and sleep apnea with dry eye syndrome (keratoconjunctivitis sicca) and problematic photophobia. (*Id.*) On physical exam, Dr. Cush noted dry eyes and mouth, dry skin, dry cough, five tender joints, a global arthritic score of 19 and eight out of 18 trigger points. (Tr. 733.) He opined that Sjogren's syndrome is suggested clinically and recommended a salivary gland biopsy. (*Id.*) He also diagnosed osteoarthritis in the right knee and bilateral CMC joints and myofascial pain syndrome. (*Id.*)

Plaintiff attended an ophthalmology exam on February 9, 2010, and was diagnosed with dry eye syndrome. (Tr. 676.) A lip biopsy in February 2010 confirmed the diagnosis of Sjogren's syndrome. (Tr. 675, 685, 764.) On February 24, 2010, Dr. Cush opined that the diagnosis of Sjogren's syndrome is based on xerostomia, xerophthalmia, photophobia, left facial numbness, dry

sky, vaginal dryness, upper pharyngeal dysphagia, raynaud, a positive lip biopsy, and seronegative ANA/SSA. (Tr. 735.) Dr. Cush also noted multiple areas of soft tissue tenderness with trigger points bilaterally at C5-7, cervical, trapezius, supraspinatus, upper/outer gluteals, and medial fat pad of the knee, and diagnosed Fibromyalgia with poor sleep and tender points. (*Id.*) Dr. Cush opined that Plaintiff is disabled. (*Id.*) In August 2010, Dr. Cush noted a diagnosis of Sjogren's syndrome and Fibromyalgia, and again opined that Plaintiff is disabled. (Tr. 736.)

Plaintiff was admitted to Medical City Hospital on October 7, 2010, for severe migraine. Examination of her eyes was difficult due to her severe photophobia. (Tr. 765.) An MRI of the brain showed mild nonspecific microvascular or migraine changes in both hemispheres with severe inflammatory opacification of the right maxillary sinus. (Tr. 729.) An MRI of the neck showed enlargement of the left parotid gland and MRI of the brain showed infundibulum in the left posterior communicating artery, for which follow-up was recommended to rule out future aneurysm. (Tr. 764.) Plaintiff was treated with IV fluids and medications and discharged on October 8, 2010. (*Id.*)

Plaintiff saw Dr. Salam on October 20, 2010, for low back and left leg pain with difficulty sitting and standing. (Tr. 695.) Physical exam findings included difficulty bearing weight on the left leg, decreased sensation in the front and back of the left leg, and muscle tenderness in the lower back. (*Id.*) An MRI of the lumbar spine revealed a left L4/5 paracentral and foraminal herniation with probable impingement on the traversing Left L5 nerve root, disc bulging and spondylosis at L1 through L4, mild scoliosis, and prominent perineural cysts. (Tr. 703-704.) Dr. Salam referred Plaintiff to neurosurgeon John R. Tompkins, M.D., who noted diffuse weakness and sensory loss in the left leg with a positive straight leg raise. (Tr. 722-724.) Dr. Tompkins diagnosed L4/5 lateral disc herniation and recommended pain management beginning with epidural steroid injections. (Tr.

724.)  Plaintiff sought pain management through Turtle Creek Pain Management and received at least eight epidural injections.  (Tr. 746-762.)  Physical exam findings included muscle weakness with limited range of lumbar motion, positive straight leg raise, and tenderness to palpitation.  (Tr. 746.)

Dr. Cush examined Plaintiff on December 1, 2010, and noted that all trigger points were tender to palpitation, bilaterally, and that she exhibited multiple areas of soft tissue tenderness.  (Tr. 727.)  Dr. Cush opined that Plaintiff suffers from active impairments including photophobia, migraine, Sjogren's syndrome, irritable bowel syndrome, and facet arthropathy with a herniated lumbar disc, and stated his opinion that Plaintiff is disabled.  (*Id.*)

## The First Hearing

### Plaintiff's Testimony at the First Hearing

Plaintiff testified that she has headaches four to five days out of seven.  (Tr. 34.)  She indicated she has to "stay totally dark" by wearing the glasses because artificial lights are very difficult for her to handle.  (*Id.*)  She uses dots or Velcro straps on her appliances so that she may use them by feeling the straps.  (Tr. 40.)  She also has pins on her clothes corresponding with the color of the clothing so she can feel them and coordinate what she's wearing.  (Tr. 44.)

Plaintiff testified that she has a lady come in to help her with her household work. She stated that her functioning during the day depends on the severity of her headaches, although she is consistently very slow.  (*Id.*)  Plaintiff described numbness on the left side of her body that sometimes causes her to drop things.  (Tr. 41.)  She reported that she gets vertigo if she turns suddenly or bumps into something, and cannot bend due to vertigo.  (Tr. 42.)  She stated a friend drove her to the hearing, and her friends take her grocery shopping.  (Tr. 43.)  Plaintiff says she is not able to knit or

8

crochet anymore, but she listens to the radio.  (Tr. 48.)  She stated she has not driven a car since 2006.

(Tr. 38.)

### Testimony of the Medical Expert ("ME") at the First Hearing

Dr. Devere, the ME, testified that none of Plaintiff's problems, including headaches and

photophobia, are clearly described or fit into a Social Security Listing.  (Tr. 35.)  He then stated that

"clearly she's not able to do any work" due to the frequency of the photophobia and the headaches.

(*Id.*)  He further testified that because Plaintiff did not respond to steroid therapy, she was clearly in

an atypical category for her headaches.  (Tr. 36.)   Dr. Devere clarified that Plaintiff's diagnoses

were based mostly on her subjective complaints because the doctors did not know how to classify

them, but he believed what Plaintiff was saying.  (Tr. 36-37.)  He repeated that Plaintiff is not able

to do any work based on the frequency of headaches and her need to be in a dark room.  (Tr. 36.)

### Testimony of the Vocational Expert at the First Hearing

The VE at the first hearing classified Plaintiff's past relevant work as administrative assistant

(sedentary and skilled with a Dictionary of Occupational title ("DOT") code of 169.167-010).  (Tr.

49.)  The expert testified that if an individual could not maintain eight-hour workday or 40-hour

workweek on a consistent basis, the person would be unemployable.  (*Id.*)

### The Second Hearing

### Plaintiff's Testimony at the Second Hearing

At the second hearing on January 20, 2011, Plaintiff testified that since the first hearing, she

had been diagnosed with level 4 Sjogren's disease.  (Tr. 55.)  She stated that due to her Sjogren's

disease, she was very dry, and her body didn't produce enough moisture.  (*Id.*)  She testified that her

ongoing problems with light sensitivity are related to Sjogren's disease.  (Tr. 56.)  She stated that she

9

continues to have constant problems with photophobia and must wear layers of dark glasses and often has to close her eyes to "go anywhere." (Tr. 56-57.) She said that since the last hearing, she has been getting Sarapin shots in her lower back, up her spine, and in her cranial nerves. (Tr. 50.) She stated that she has developed back pain and left leg numbness and has been diagnosed with a herniated disc. (*Id.*) She stated she may have to have surgery at L4 and L5 if the Sarapin shots do not help. (Tr. 60.) She stated she has to lie down during the day and that she spends most of the day in the completely dark second story of her home. (*Id.*) She stated that she experiences mental slowness after taking Maxalt. (Tr. 61.) Plaintiff said that she has been advised to exercise and recently began using a treadmill, walking at a rate of 1.5 miles per hour for 15 minutes. (Tr. 62.) Previously, she exercised by using little weights and going up and down the stairs in her home. (*Id.*) She testified that she has befriended ladies with vision problems, who urged her to start knitting again, which she was trying to do using "huge needles." (Tr. 63.) She stated that her home computer has been adjusted so that the computer screen is completely dark and the computer "speaks" to her, which allows her to check emails. (Tr. 64.) She testified that she has not driven since 2006 and does not leave her house unaccompanied. (Tr. 59, 64.)

### Testimony of the Vocational Expert at the Second Hearing

The VE at the second hearing classified Plaintiff's past relevant work as an executive assistant or administrative secretary (sedentary and skilled, with a DOT code of 169.167-014). (Tr. 65.) The expert testified that if a hypothetical individual could lift or carry 10 pounds occasionally, sit six hours, stand or walk two hours, could never climb ladders or ropes, could occasionally balance, stoop, kneel, crouch and crawl, that she would be able to perform her past relevant work. (*Id.*) The

expert testified that if an individual could not maintain an eight-hour workday or a 40-hour workweek and would have to work in a dark room, then the individual would be unemployable.  (*Id.*)

## The ALJ's Decision

The ALJ analyzed Plaintiff's claim using the five-step sequential evaluation process.[6]  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 14, Finding No. 2.)  At step two, the ALJ determined that Plaintiff's severe impairments were Sjogren's syndrome, osteoarthritis, and irritable bowel syndrome. (Tr. 14, Finding No. 3.)  The ALJ noted Plaintiff's diagnosis of fibromyalgia syndrome and noted the Appeals Council's finding that the claimant had photophobia, sleep apnea, ptosis of the eyelid, high blood pressure, and an adjustment disorder.  (Tr. 14, Finding No. 3.)  At step three, the ALJ found that Plaintiff's impairments failed to meet or equal any of the listed impairments for presumptive disability under the regulations.  (Tr. 14, Finding No. 4.)

The ALJ next determined that Plaintiff's subjective complaints were not fully credible.  (Tr. 18, Finding No. 5.)  The ALJ determined that, based on the evidence as a whole, Plaintiff retained the residual functional capacity ("RFC") to perform a full range of sedentary work[7] because she could

---

[6]The five steps include: (1) Is the claimant performing substantial gainful activity?  (2) Does the claimant have a "severe" impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1 of the Social Security Regulations?  (4) Does the impairment prevent the claimant from doing past relevant work?  (5) Does the impairment prevent the claimant from doing any other work?  20 C.F.R. § 404.1520(a)(4).

[7]The regulations define sedentary work as work that involves lifting no more than 10 pounds at a time, and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 404.1567(a).

stand or walk for two hours a day, could never climb, and could have only occasional postural movements.  (Tr. 18-19.)  At step four, the ALJ found that Plaintiff was able to perform her past relevant work as an "assistant secretary."[8]  (Tr. 19, Finding No. 6.)  Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (Tr. 20, Finding No. 7.)

## STANDARD OF REVIEW

A claimant must prove that she is disabled for purposes of the Social Security Act to be entitled to social security benefits.  *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are that:

(1)    an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings;

(2)    an individual who does not have a "severe impairment" will not be found to be disabled;

(3)    an individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors;

(4)    if an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" will be made; and

---

[8]    The VE actually classified Plaintiff's past relevant work as "executive assistant" or "administrative secretary" rather than an "assistant secretary."  (Tr. 65.)

    (5)      if an individual's impairment precludes the individual from performing the work the individual has done in the past, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990) (paraphrasing 20 C.F.R. § 404.1520(b)-(f)).

    The burden of proof lies with the claimant to prove disability under the first four steps of the five-step inquiry. *Leggett*, 67 F.3d at 564. The burden of proof shifts to the Commissioner at step five of the inquiry to prove that other work, aside from the claimant's past work, can be performed by the claimant. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989)). If the Commissioner demonstrates that other jobs are available to the claimant, the burden of proof shifts back to the claimant to rebut such a finding. *Selders v. Sullivan* , 914 F.2d 614, 618 (5th Cir. 1990).

    The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits was supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### Issues

1.      Whether the ALJ erred at Step 2 in classifying Plaintiff's impairments of photophobia, fibromyalgia, and adjustment disorder as non-severe, and by completely ignoring her impairment of lumbar disc herniation.

2.      Whether the ALJ erred in evaluating the medical evidence and in failing to follow 20 C.F.R. 404.1527(d)(2) and Social Security Rulings 96-2p and 96-5p.

3.      Whether the ALJ erred in evaluating Plaintiff's credibility and failed to follow 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p.

4.      Whether the decisional RFC violates Social Security Ruling 96-8p because the ALJ failed to explain why the treating medical source opinions were not adopted and why symptom-related limitations were not incorporated into the RFC assessment.

### Analysis

### Legal Error at Step 2

The Court will first address whether the ALJ committed legal error at Step 2 that requires reversal.   In the ALJ's first decision, he found that Plaintiff had no medically determinable impairments but only alleged symptoms including headaches, vertigo, vision and photophobia. (Tr. 74, Finding 3.)  On review, the Appeals Council vacated the ALJ's decision and remanded the case. (Tr.  78.)  The Appeals Council found that Plaintiff had the following medically determinable impairments: photophobia; sleep apnea; ptosis of the eyelid; and high blood pressure/hypertension. (*Id*.)

The Appeals Council ordered the ALJ upon remand to "evaluate the severity and limiting effects of claimant's impairments and obtain additional evidence, if necessary, in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CRF 404.1512-1513)."  The ALJ was ordered to

"complete the Step 2 analysis of the sequential evaluation process ("SEP"), for the above stated impairments, in accordance with Social Security Ruling 85-2p and proceed, as appropriate, to Steps 3, 4, and 5).   The additional evidence might include, if warranted and available, consultative examinations with a psychologist or psychiatrist and internist and medical source statements about what the claimant can still do despite the impairments."  Also the Appeals Council ordered the ALJ to "[further evaluate, the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c)." Finally, the ALJ was ordered to "offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision."  (Tr. 78-79.)

Plaintiff contends that the ALJ erred at Step 2 by classifying Plaintiff's impairments of photophobia, fibromyalgia and adjustment disorder as non-severe and by completely ignoring her impairment of lumbar disk herniation.  The Commissioner responds that both substantial evidence and relevant legal precedent support the ALJ's step two severity determination.  (Tr. 14-19.)  The Commissioner argues that the ALJ complied with the Fifth Circuit's requirements at Step 2 of sequential evaluation by specifically citing *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir.1985). (Tr. 18.)

Pursuant to Social Security regulations, a severe impairment is "any impairment or combination of impairments which significantly limits (a claimant's) physical or mental ability to do basic work activities." 20 C.F.R. 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality (having) such minimal effect on the individual that it would

not be expected to interfere with the individual's ability to work." *Stone*, 752 F.2d at 1104-05.  The Fifth Circuit further ruled that unless the ALJ specifically uses the correct severity standard by referring to the *Stone* opinion or another opinion of the same effect,  or by an express statement that the correct construction of 20 C.F.R. § 404.1520(c) (1984) is used, then the court must assume the ALJ and Appeals Council applied an incorrect standard to  the severity requirement and reverse the decision denying benefits and remand the case to the  Commissioner. *Id*. at 1106.

In this case, the ALJ cited *Stone*, but he never mentioned the actual standard of severity required by the *Stone* case, nor did he show that he actually applied this standard in evaluating Plaintiff's medical impairments.  (Tr. 18.) The ALJ must *apply* the correct standard of severity; otherwise the case must be remanded.  *Stone* at 752 F.2d at 1106; *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir.1986).

The record shows that many physicians treated Plaintiff's photophobia, variously describing it as severe photophobia, profound photophobia, extreme photophobia, and incapacitating photophobia.  None of Plaintiff's treating or examining physicians described Plaintiff's photophobia as non-severe.  Numerous medical reports stated that Plaintiff had extreme sensitivity to light, causing her to spend most of her time in a darkened room.  Plaintiff contends that these medical reports suggest significant work related  limitations, much greater than the just more than minimal effect required for a finding of severity. (Tr. 321, 351,  400, 401, 407, 426, 429, 431, 765, 771).  The Court agrees and notes that the Commissioner's own medical expert, Dr. Devere, stated that he believed Plaintiff and that she could not work due to photophobia.  (Tr.  36.)  Dr. Devere's opinion supports the conclusion that photophobia would significantly interfere with basic work activities. (Tr. 35-36).  The ALJ incorrectly described Dr.  Devere's testimony when the ALJ stated that Dr.

Devere "adopted the State Agency opinion at Exhibit 10F and found no basis for the symptoms." (Tr. 16). The record shows that Dr. Devere did not adopt any medical opinions. (Tr. 32-37.) Moreover, he did not make a residual functional capacity assessment. (*Id.*) Dr. Devere indicated that Plaintiff's headaches were atypical but did not state that there was "no basis for the symptoms." (*Id.*) In fact, as previously mentioned, he stated that he "believes what [Plaintiff] is saying," and concluded that Plaintiff would not be able to work. (Tr. 35-36.)  Although Dr. Devere stated that his opinion was based upon subjective complaints rather than an objective test, Dr. Devere's review of evidence and testimony took place on August 20, 2008, well before the treating rheumatologist, Dr. Cush, described the objective tests confirming severe photophobia on December 1, 2010. (Tr. 727.)

In finding that Plaintiff's photophobia was non-severe, the ALJ relied on the lack of objective tests at the time of Dr. Devere's testimony and the similarly premature report of a one time non-examining medical consultant, Jerome Byers, M.D. Dr. Byers reviewed the medical evidence of record on August 4, 2006, and made his report. (Tr. 625-26).  However, Dr. Byers' review of the medical records did not include reports from the Mayo Clinic Neurology Department. The later medical records documented Plaintiff's profound photophobia. (Tr. 397-411). Surprisingly, the ALJ gave controlling weight to a non-examining consultant's review and opinion that was completed long before the diagnosis of Sjogren's syndrome was confirmed by a biopsy and by Plaintiff's treating rheumatologist. (Tr. 727.)

The rheumatologist explained that Plaintiff's Sjogren's syndrome diagnosis was based on:

xerostomia, xerophthalmia, photophobia, facial numbness, dry skin, vaginal dryness, upper pharyngeal dysphagia, raynaud, lip biopsy focus score 2 and seronegative (ANA/SSA) 219-10 normal lobal architecture with mixed acim, mildly dilated ducts, mixed scattered inflammatory cells, mild fibrosis, 2 foci of inflammatory cells with focus score=2 (Grade IV)

17

(Tr. 727.)   Thus the rheumatologist linked Plaintiff's photophobia, or sensitivity to light, to her Sjogren's syndrome.   (Tr. 727-736).   The ALJ erred at Step 2 by finding Plaintiff's chronic photophobia non-severe without considering it in connection with the substantial record evidence of Plaintiff's migraine headaches and Sjogren's syndrome under the *Stone* standard.

The ALJ failed to mention Plaintiff's medical impairment of lumbar disc disease.  He failed to consider this impairment at Step 2 and to assess its severity. The testimonial and medical evidence indicates that Plaintiff has difficulty sitting, standing and walking for prolonged periods due to chronic lower back pain.  (Tr. 58-60, 722, 744, 748-758.)  An October 20, 2010 MRI of the lumbar spine revealed a left L4/5 paracentral and foraminal herniation with probable impingement of the traversing left L5 nerve root, disc bulging and spondylosis at L1/4, and prominent sacral perineural cysts. (Tr. 703-704).  In addition, numerous physical exams demonstrated decreased sensation in the lower extremities, weakness in the quadriceps, abnormal gait, and decreased range of motion of the cervical and lumbar spine.  (Tr. 695, 722, 746, 748-757, 760-61.)  Hunter received eight epidural steroid injections in 2010. (Tr. 748-757).  She testified that she experiences back pain with left leg pain and numbness.  (Tr. 58-60).  The ALJ erred by failing to consider this medically documented impairment at Step 2 under the *Stone* standard.

Plaintiff also urges that the ALJ erred by finding her Adjustment Disorder and fibromyalgia to be non-severe.  The Court finds that the ALJ failed to follow the *Stone* standard in assessing the severity of at least two of Plaintiff's medically determinable impairments.  The ALJ thus committed legal error, and the Commissioner's decision should be reversed and the case remanded to the Commissioner for further proceedings beginning at Step 2.  On remand, the Commissioner should reassess whether Plaintiff's medically determinable impairments of photophobia, fibromyalgia,

18

adjustment disorder, and lumbar disk herniation are severe by setting forth and applying the Stone standard. *Stone*, F.2d at 1106.

Additionally, the Court notes that the ALJ did not consider limitations related to Plaintiff's photophobia in assessing Plaintiff's RFC. Even if the Court had not found that reversal is required by legal error at Step 2 and had considered the error to be procedural rather than legal error, reversal and remand would still be required because the omission of any such limitations substantially harmed Plaintiff at the RFC determination stage of the proceedings.

### The ALJ's Evaluation of the Medical Evidence

When an ALJ determines a claimant's residual functional capacity, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 404.1545(e), 416.945(a)(2), 416.945(e). A medically determinable impairment is one that is "demonstrated by 'medically acceptable clinical and laboratory diagnostic techniques.'" *Greenspan v. Shalala,* 38 F.3d 232, 239 (5th Cir.1994) (quoting 42 U.S.C. § 423(d)(3)).

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir.2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.1995)). "[A]bsent reliable medical evidence from a treating or examining physician controverting [a] claimant's treating specialist, an ALJ may reject the opinion of [a] treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth" in the regulations governing Social Security claims. *Id.* at 453. According to Social Security Ruling ("SSR") 96-2p, the ALJ must give specific reasons for the weight he or she gives to the treating

source's medical opinion, supported by the evidence in the case record, and the reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Further, the ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Id.*

Plaintiff contends that the ALJ erred in evaluating the medical evidence and failed to follow 20 C.F.R. 404.1527(d)(2) and Social Security Rulings 96-2p and 96-5p. The Commissioner responds that there is no merit to Plaintiff's claim that the ALJ failed to discuss and explain the weight of other medical sources because the statements referenced were not medical opinions, but were conclusions that Plaintiff was "disabled," citing Tr. 400, 429, 727, 735-36. The Court has reviewed reports of treating rheumatologist, John J. Cush, M.D., of Ambareen Salam, M.D., and of treating neurologist Dr. Cutrer, cited by Plaintiff in support of her contention that the ALJ failed to discuss and explain the weight given to treating medical source statements. The reports were not simply conclusory opinions that Plaintiff was disabled, a decision reserved to the Commissioner. Rather, they were medical records which included diagnoses, progress reports, and treatment plans. For example, the Commissioner cites the neurologist's April 21, 2008 report (Tr. 400) as merely an opinion that Plaintiff is disabled. A review of this medical record reveals that it contains the treating neurologist's report of a follow-up visit on April 21, 2008, in which he diagnoses Plaintiff with "profound photophobia." The report states that Plaintiff had been evaluated in terms of her eyes and for some brain lesion that could account for her new headaches and profound photophobia. (*Id.*) The treating

20

neurologist prescribed amitriptyline; verapamil; Maxalt, as needed; and ketoprofen as needed and told Plaintiff to return for a follow-up in six months. (*Id.*) The report did not even conclude that Plaintiff was "disabled." A similar example of why the Commissioner's position is not well taken is a report of the progress notes of the Arthritis Care and Research Center. The treating rheumatologist diagnosed Plaintiff with Sjogren's syndrome and prescribed Neurontin for Plaintiff's low back pain from a fall and herniated disc. Although the notes contain the words "limitations: patient is disabled," as with the other medical records of Plaintiff's treating physicians, the records contained substantial medical evidence from treating physicians which the ALJ neither mentioned, assigned weight to, nor explained.

The Court has thoroughly reviewed the ALJ's decision. To support his conclusions that the objective evidence does not support Plaintiff's allegations and that Plaintiff does not have medically determinable impairments, the ALJ relied heavily on his September 18, 2008 decision. As stated, the Appeals Council reversed and remanded that decision for further consideration at Step 2 and because the substantial evidence did not support the ALJ's first denial. (Tr. 16, 18, 78.)

The ALJ's decision also relied upon the testimony provided by medical expert, Dr. Devere, at the first hearing. However, as the Court has previously noted, the ALJ incorrectly asserted that Dr. Devere "adopted the State Agency opinion at Exhibit 10F and found no basis for the symptoms" (Tr. 16). Dr. Devere neither adopted the State Agency opinion, nor provided any opinion regarding Plaintiff's residual functional capacity. (Tr. 32-37). A review of Dr. Devere's testimony clearly indicates that he attributed Plaintiff's photophobia and headaches to a migraine syndrome, that he believed her testimony, and that he gave his expert opinion that Plaintiff was not capable of

sustaining any work activity.[9]  Further, although the ALJ correctly stated that Dr. Devere's opinion was that Plaintiff's symptoms were subjective and documented by no objective tests, the ALJ failed to clarify that Dr. Devere's review took place on August 20, 2008, before Plaintiff's biopsy and many of her later consultations with her treating physician, her treating neurologist, and her treating rheumatologist.

Further, the ALJ generally assigned "controlling weight" to, and discussed, only the evaluations of the non-examining state agency medical consultants ("SAMCs"). (Tr. 18). The ALJ specifically referenced only one medical opinion, that of non-examining state agency medical consultant, Jerome Byers, M.D., an ophthalmologist who reviewed Plaintiff's file on August 3, 2006 (Tr. 18). Dr. Byers review took place before Plaintiff attended an ophthalmology exam on February 9, 2010, where she was diagnosed with dry eye syndrome. (Tr. 676.) It also preceded the medical records of Dr. Cush, the treating rheumatologist, who documented clinical and laboratory findings including a lip biopsy that diagnosed Sjorgen's Syndrome, a medical impairment which could reasonably be expected to cause dry eyes and extreme sensitivity to light. (Tr. 675, 685-86, 727-735). Yet the ALJ gave controlling weight to Dr. Byers' early review of the medical records in finding that Plaintiff's photophobia was non-severe. The ALJ never acknowledged the confirming biopsy; rather, he stated only that "the claimant *testified* she has been diagnosed with Sjogren syndrome." (Tr. 17.)

Proper circumstantial evidence is enough to prove disability. *Greenspan*, 38 F.3d at 239. Such evidence, under the regulations, includes "signs," anatomical, physiological, or psychological abnormalities that can be observed, 20 C.F.R. § 404.1528(b), and "laboratory findings," anatomical,

---

[9]  It is generally accepted that there is no objective test for migraine or cluster headaches and diagnosis is based on history and tests that rule out other causes of headaches.

physiological, or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques, *id.* § 404.1528(c).   *Id.*   The ALJ's conclusion that Plaintiff's medical impairments are not supported by recognized laboratory or diagnostic techniques is not supported by the record.

Dr. Cush's records further document clinical signs of osteoarthritis and fibromyalgia, which contribute to Plaintiff's allegations of chronic pain and fatigue. (Tr. 727-735).   Furthermore, the records from Drs. Salam and Tompkins, as well as Turtle Creek Pain Management, document lumbar degenerative disc disease with muscle weakness, limited range of motion, decreased sensation and a positive straight leg raise, which corroborate Plaintiff's testimony regarding back and leg pain. (Tr. 695, 703-704, 722-734, 746-762).   Additionally, a review of the medical evidence shows Plaintiff was treated with prescription medication for severe and profound photophobia.  (Tr. 329, 332, 370,-71, 374, 376, 409, 562.)  Evaluations at Brooke Army Medical Center showed persistent ptosis of Plaintiff's eyelid continuing on downgaze and evidence of severe sensitivity to light even in a dark room as well as visual tests at 20/40.  (Tr.  371, 377-78.)  In 2010, Plaintiff was admitted to the hospital with nausea and vomiting as a result of a severe headache, and after an MRI of the neck showed enlargement of the left parotid gland which the physician suspected could be related to her Sjogren's syndrome, she was referred to a neurologist for follow-up.  (Tr.  765.)

The ALJ's failure to discuss these medical opinions and to give good reasons for the decision to omit assigning any weight to them is contrary to Social Security Rulings 96-2p and 96-5p and 20 C.F.R. §404.1527(d).  The ALJ erred in evaluating the medical evidence and his RFC determination is not supported by substantial evidence.

**Conclusion**

Because remand is required beginning at Step 2, the Court will not consider the remaining issues for review.   However, *upon this second remand at Step 2*, the Commissioner should reassign this case to a different ALJ and ensure that he or she properly considers all of the issues.

**Recommendation**

The Court recommends that the District Court grant Plaintiff's Motion for Summary Judgment and deny the Commissioner's Motion for Summary Judgment.   The Court further recommends that the District Court reverse and remand this case to the Commissioner with instructions that the case be reconsidered by a different ALJ beginning at Step 2 of the sequential evaluation process.

Signed September 6, 2012.


_____

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

24

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).